**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL J. VOLEK**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.  12-1577 |
| | ) | |
| **REDEVELOPMENT AUTHORITY OF** | ) | |
| **THE COUNTY OF FAYETTE,** | ) | |
| **ANDREW FRENCH, AL JEFFRIES** | ) | |
| and **WARREN HATFIELD,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

**CONTI, Chief District Judge**

Michael Volek ("Volek") contends that his former employer, the Redevelopment Authority of the County of Fayette (the "Authority"), and three of its employees, Andrew French ("French"), Al Jeffries ("Jeffries"), and Warren Hatfield ("Hatfield") (collectively "defendants"), terminated his employment in retaliation for complaints he filed with two state agencies in late 2011, which complaints accused the Authority of fraud and abuse.  Specifically, Volek brings a claim, pursuant to 42 U.S.C. § 1983, alleging that defendants violated his First Amendment rights, and a claim for relief under Pennsylvania's Whistleblower Statute, 43 Pa. Cons. Stat. § 1423(a).   Volek seeks compensatory damages against all defendants, and punitive damages against the three individual defendants. (ECF No. 1 at 6, 7-8.)

Defendants filed a joint motion for summary judgment, (ECF No. 33), a brief in support of the motion, (ECF No. 39), a concise statement of material facts, (ECF No. 36), and a reply brief, (ECF No. 49).   Volek filed a response to defendants' concise statement of facts, (ECF No. 45), his own concise statement of material facts, (ECF No. 44), and an opposition brief (ECF No. 46).  After the close of briefing, the parties submitted a joint concise statement of material facts. (ECF No. 50.)

In their motion, defendants argue that Volek's claims cannot survive summary judgment because there is no proof of causation. (ECF No. 39 at 7-16.)   In opposition, Volek contends that the record contains ample evidence that he was terminated because he complained about the Authority's operations. (ECF No. 46.)  For the reasons that follow, defendants' motion will be granted.  There is no evidence that rises above the level of speculation and supposition that defendants were aware that Volek filed a complaint against the Authority before the decision to eliminate his position was made.  Even if a reasonable inference could be drawn that the Authority was aware that Volek submitted a complaint before it decided to eliminate his position, which would provide at least some factual predicate for a reasonable jury finding that Volek's complaints caused his termination, there is no genuine dispute that the Authority would have eliminated Volek's position even without that knowledge.

Judgment will be entered in each defendant's favor on both claims and this case will be closed.

# I. **FACTUAL BACKGROUND**

All material facts set forth herein are undisputed unless otherwise indicated. Additional material facts may be discussed elsewhere in this memorandum opinion, in context.

As an initial matter, because the parties did not sequentially number the defendants' and plaintiff's statements of fact in the combined concise statement of material facts, the court uses the format ¶ D1 and ¶ P2, to refer to defendants' and plaintiff's factual statements, respectively. With respect to the substance of the combined concise statement of material facts, the court notes that many of the purported "disputes" about the facts are not based on conflicts in the record evidence, and, therefore, are not genuine disputes that would preclude summary judgment. Specifically, Volek's repeated assertion that the individual defendants' testimony should be disregarded because they are "interested witnesses" lacks merit. (ECF No. 50 ¶¶ D25, D42, D45-46, D51-54, D56, D58.) The Court of Appeals for the Third Circuit instructs district courts to "believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness." Acosta v. HOVENSA, LLC, 529 F.App'x 297, 301 n.3 (citing Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 272 (3d Cir. 2007)); see Benjamin v. City of Atlantic City, No. 12-3471, 2014 WL 884569, at *7 n.3 (Mar. 6, 2014) (citing decisions in which district courts refuse to disregard the testimony of "interested witnesses" on summary judgment).

As a result, the court found it necessary to review the underlying record itself to determine those facts that are reasonably disputed, and those that are not. In doing so, all reasonable inferences are drawn in favor of Volek, the nonmoving party. Inferences based upon speculation or conjecture, however, do not create a material factual dispute sufficient to defeat

entry of summary judgment. <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

      **A.  <u>Volek's Employment</u>**

      The Authority serves as the principal agency in Fayette County, Pennsylvania, responsible for community development and single-family affordable housing activities. (ECF No. 50 ¶ D2.) Some of the Authority's functions are to administer a homeowner rehabilitation program and a weatherization program, which provides assistance to individuals to make energy efficient improvements to their homes. (<u>Id.</u> ¶ P1.) The Authority operates on funds received from the state and federal government. (<u>Id.</u>) The American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. No. 111-5, 123 Stat. 115, was one economic measure that resulted in additional funding to the Authority's weatherization department during 2010 to 2012. (<u>Id.</u> ¶ P2.) Funding under the ARRA was not permanent. (<u>Id.</u> ¶¶ D42, D61.)

      Volek was hired by the Authority in 2008 as an installer, and was promoted to the position of crew leader, and ultimately weatherization specialist. (<u>Id.</u> ¶¶ P10, P11.) Volek's direct supervisor was Hatfield. (<u>Id.</u> ¶¶ D60, P7-8, P77.) Hatfield was an hourly employee; he supervised Volek, but was not a management-level employee. (<u>Id.</u> ¶ D60.) Hatfield reported to Jeffries, who was the Authority's weatherization director and managed all aspects of the Authority's weatherization program. (<u>Id.</u> ¶¶ D6, P7.) Jeffries reported to French, who was the Authority's executive director and was responsible for management of all Authority departments and programs, and all human resources issues. (<u>Id.</u> ¶ D2.)

      At all relevant times, the Authority employed two weatherization specialists, also referred to as auditors; Volek and Brian Welsh ("Welsh"). (<u>Id.</u> ¶¶ D7, P12.) Weatherization specialists visit residents' homes, complete various inspections or tests, and make an initial

assessment and recommendation with respect to work that can be done to improve the energy efficiency of the home, such as, for example, repairing or replacing windows, boilers, or furnaces. (Id. ¶¶ D2, D7, P12, P21.) The inspections could be completed as part of a government program, usually pursuant to a grant, including, for example, the ARRA, or on behalf of a utility company, which would reimburse the Authority for the work pursuant to contract. (Id. ¶¶ D61, P13, P15.)

If the weatherization specialist recommends that a furnace be replaced, an independent furnace contractor would re-inspect the furnace, and confer with Hatfield and Gary Bingham, the Authority's furnace inspector, to determine whether the furnace should be replaced. (Id. ¶¶ D8, P17-18.) The authority is expected to attempt to repair a furnace before replacing it. (Id. ¶ P22.) If a replacement is warranted, one of the Authority's installers would perform the work, and the Authority would send an employee back to the home to complete a final inspection of the project. (Id. ¶¶ D8, P19.) At some point in 2011 or 2012, Lloyd Wilson ("Wilson"), an employee of Pennsylvania's Department of Community & Economic Development ("DCED") and the Authority's DCED-assigned state monitor, instructed the Authority that the final inspection should not be completed by the same employee who did the initial assessment. (ECF No. 50 ¶¶ D9, D67, P12, P19; ECF No. 47 at 98-99 (Hatfield Depo. at 61:2-64:23); at 279-80 (Wilson Depo.).)

The record is internally inconsistent about when Wilson gave the Authority this instruction, although no party acknowledges the incongruity in the evidence. Volek contends that Wilson must have given this instruction before his May 22, 2011 retirement, but claims that the Authority did not remove Volek from final inspections until after October 2011, purportedly proving that the delayed action was taken in retaliation for his complaints to governmental

agencies about the Authority's fraudulent conduct. (ECF No. 50 ¶ D9.) At the same time, however, Volek relies on Wilson's report to the Authority, in December 2011, that the DCED received a complaint letter about the Authority to prove causation. (Id. ¶ D19, D29, D47.) It is illogical, without further explanation, that Wilson informed the Authority of the DCED's receipt of a complaint letter in December 2011, if he retired from the DCED more than six months earlier. Not only is that timeline illogical, but it is also directly contradicted by the record. Wilson explains that he knew about the complaint letter, and reported the same to the Authority, because it was within his job duties at the DCED to do so. (ECF No. 47 at 269-71, 275 (Wilson Depo.).) Wilson testified that he learned about the letter "a short time before I retired." (Id. at 271 (Wilson Depo.).) Likewise, Jeffries testified that Wilson was "already on his way out" in December 2011. (ECF No. 47 at 128 (Jeffries Depo. at 74:16-18).) No witness asserts that Wilson had been retired from the DCED for more than six months when he called Jeffries to tell him that the DCED received a complaint letter about the Authority. No witness offers an explanation about how Wilson would possess that information if he were no longer employed by the DCED. Although it appears likely, therefore, that Wilson retired in May 2012, not May 2011, the discrepancy with respect to Volek's date of retirement does not preclude entry of judgment as a matter of law because, as explained elsewhere in this opinion, any resultant factual disputes are immaterial.

In an August 21, 2010 e-mail, Jeffries recommended to French that half of Volek's $1.50 per hour pay raise be contingent on improved performance. (ECF No. 47 at 106 (Jeffries email); ECF No. 50 ¶¶ D10, P80.) Jeffries' recommendation was based on concerns that Hatfield expressed to him about Volek's performance. (ECF No. 47 at 106 (Jeffries email).) Jeffries' e-mail to French states that "[Hatfield] thinks [Volek] has the ability but is slacking."

(Id.)  Hatfield counseled Volek around this time about "incomplete audits." (ECF No. 50 ¶¶ D10, P78.)  Almost a year later, in June 2011, Jeffries expressed to French that Volek's "auditing performance is also still kind of weak," Volek failed to obtain the required homeowner signatures on several files Hatfield showed him, and another employee found a water heater "poorly wrapped to the point of being dangerous" at a house for which Volek performed the initial inspection. (ECF No. 47 at 107 (Jeffries email); ECF No. 50 ¶¶ D11, P81.)

In October 2011, Volek was tried on an assault charge arising out of a physical altercation at a local bar that occurred in 2010. (ECF No. 50 ¶¶ D12, P66.)  Volek's arrest and criminal trial were published in the local newspaper. (Id. ¶ D12.)  Volek was acquitted at trial. (Id.)  The mother of the man whom Volek was accused of assaulting, Mary Over, complained to Jeffries and French in October 2011, about Volek disclosing, on his Facebook page, that the Over family received services from the Authority, which information Mrs. Over considered to be confidential. (ECF No. 47 at 138-43 (Over Complaint); ECF No. 50 ¶¶ D14, P67.)  Mrs. Over initiated her complaint with an inquiry into whether criminal background checks were completed on Authority employees who were sent into taxpayers' homes to complete inspections. (ECF No. 47 at 143 (Over Complaint).)  The Authority took no action against Volek as a result of Mrs. Over's complaint. (ECF No. 50 ¶ D14.)   The Authority did, however, remove Volek from performing inspections pursuant to utility company contracts, which specifically required criminal background checks, for some period of time in 2011 or 2012, and ordered a criminal background check on Volek in January 2012. (ECF No. 50 ¶¶ P71-72.)   Volek had undergone a criminal background check before he was hired in 2008. (Id. ¶ P71.)

In March 2012, Volek alleged that he suffered an injury at work and was limited in his ability to perform lifting tasks at work. (Id. ¶ D69.) Mark Santillo ("Santillo") began to accompany Volek on inspections around this time. (Id.) Volek denies that Santillo accompanied him due to his injury, and alleges that he was, instead, directed by Hatfield to train Santillo to perform his job. (Id.)

### B. Volek's Complaints About the Authority

In September 2011, Volek first contacted John Manz ("Manz") to raise concerns with respect to "dishonest" activity that Volek observed at the Authority. (ECF No. 47 at 27 (Volek email); ECF No. 50 ¶ P31.) Manz was the director of weatherization training for the DCED. (ECF No. 47 at 269-70 (Wilson Depo.); ECF No. 50 ¶ P31.) Volek explains that he contacted Manz because, during training classes, Manz invited all students to contact him with questions or concerns that might arise in the field. (ECF No. 50 ¶ P31-32.) Manz referred Volek to Craig Heim ("Heim") the executive director of the Office of Energy Conservation & Weatherization of the DCED, with whom Volek communicated by e-mail and telephone in late October and early November 2011. (ECF No. 47 at 28 (Heim Depo.); ECF No. 50 ¶¶ D4, P31, P35.) Heim, in turn, referred Volek to the state's Office of the Inspector General ("OIG"), which is an arm of the Governor's Office that investigates allegations of fraud and abuse in the state's agencies, which communicated with Volek in November 2011. (ECF No. 47 at 29 (Heim email); ECF No. 50 ¶¶ D4, P36, P38-40, P42.) Volek's complaints to these agencies were that the Authority unnecessarily replaced furnaces, including using fraudulent photographs to justify replacement, and gave preferential treatment to friends and family members. (ECF No. 50 ¶ D4, P41.)

Volek contends that he made multiple complaints to Hatfield and Jeffries, beginning in 2010, about these same issues. (ECF No. 50 ¶ 10.) Defendants dispute this fact. The court must accept Volek's version of the facts as true for purposes of summary judgment, but must nevertheless ensure that there is some record evidence to support Volek's contentions. As an initial matter, Volek submitted a declaration for purposes of summary judgment indicating that he made multiple complaints to Jeffries and Hatfield about unnecessary furnace replacements and preferential treatment from approximately the summer of 2010 through 2011. (ECF No. 47 at 285-86 (Volek Dec.).) A declaration, however, cannot contradict record evidence, without an explanation of that contradiction. Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253-54 (3d Cir. 2007).

According to Volek's deposition testimony, the earliest Volek complained to Hatfield or Jeffries was September 2010. (ECF No. 47 at 10 (Volek Depo. at 29:6-9 (complaint to Hatfield with respect to duplicate pictures of cracked furnaces in September or November 2010).) Volek points to no other record evidence to support his declaration statement that he complained to Hatfield or Jeffries in the summer of 2010; instead, the record reflects that, with the exception of the September 2010 complaint, all other internal complaint activity occurred in 2011. (ECF No. 47 at 11 (Volek Depo. at 32:1-2) and 13 (Volek Depo. at 38:22-39:4 and 41:10-24) (all other internal complaints made in 2011).) To the extent Volek's declaration could be considered to create a factual dispute, the earliest date on which Volek complained to Hatfield or Jeffries, whether orally or in writing, is immaterial for purposes of deciding the instant motion for summary judgment.

The record also reflects that Volek's internal complaints were not limited to allegations of preferential treatment and unnecessary furnace replacements. In 2011, Volek submitted a written complaint to Jeffries concerning the inappropriate and unprofessional conduct of Kaylene Mehalic, a fellow employee, the unfairness of the Authority's pay scale and hiring process, and inequitable treatment of employees. (ECF No. 47 at 11 (Volek Depo. at 30:25-32:2); at 26 (complaint letter)).

The record further reflects that Volek was not the only employee to complain that certain homeowners were receiving preferential treatment; Welsh, among unidentified "others," complained about this same issue internally. (ECF No. 50 ¶¶ D64-65.) The record further reflects that Volek was not the only source of concerns with respect to the Authority's replacement of furnaces: Fayette County was identified during a 2011 audit conducted by the state's budget office and also at a state-wide industry conference as having an unusually high rate of furnace replacements. (ECF No. 50 ¶ P23; ECF No. 47 at 49 (French Depo. at 63:12-64:17).)

## C.  Audits and Investigations of the Authority

In the beginning of 2011, Pennsylvania's Office of the Budget began auditing the Authority to monitor and ensure compliance with the weatherization program. (ECF No. 50 ¶ D15.) This audit was not unusual. (ECF No. 50 ¶ D28.)

In November 2011, officials from the OIG seized files from the Authority's offices and interviewed French on the same day. (ECF No. 50 ¶ P46.) The OIG did not inform the Authority at any time during the investigation about what prompted the investigation, but explained that the OIG only becomes involved at the request of another Pennsylvania agency. (ECF No. 47 at 49 (French Depo. at 63:2-23); at 101 (Hatfield Depo. at 76:14-77:24); at 181-83

(Shaffer Depo.); at 224-25 (Smith Depo.); ECF No. 50 ¶¶ D32-33.) In February to April 2012, the OIG returned to the Authority's offices to interview employees that were assigned to the weatherization program. (ECF No. 47 at 12; ECF No. 50 ¶¶ D23, P49.)

In December 2011, Wilson informed Jeffries that Manz, the DCED's director of weatherization training, received a complaint letter about the Authority. (ECF No. 47 at 126-27 (Jeffries Depo. at 69:7-72:4); at 269-75 (Wilson Depo.); ECF No. 50 ¶ P56.) There is no indication in the record that Wilson told anyone associated with the Authority the date on which the letter was received, who wrote the letter, or what the letter said. Jeffries notified French of Wilson's report, and French directed Jeffries to contact Heim at the DCED to inquire about a complaint letter. (ECF No. 47 at 47-48 (French Depo. at 55:2-61:5); ECF No. 50 ¶ P58.) Jeffries did so, but Heim explicitly denied that the DCED received a complaint letter about the Authority. (ECF No. 47 at 47 (French Depo. at 56:5-57:12).) Volek's evidence that Jeffries wanted to know who sent the complaint letter concerns this interaction between Jeffries and Heim. (ECF No. 50 ¶¶ D31, P57.)

In early 2012, there was general speculation among the Authority's hourly employees about whether a complaint letter had been filed against the Authority and, if so, whether a homeowner, a contractor, or an employee, including Volek, may have written it. (ECF No. 47 at 102 (Hatfield Depo. at 79:21-80:18); at 129 (Jeffries Depo. at 83:14-84:13); ECF No. 50 ¶ P62.) There is no dispute that Hatfield specifically asked during his OIG interview whether the Authority was being investigated because someone filed a complaint against it, but Volek concedes that Hatfield did not name a specific employee as the suspected source of the complaint. (ECF No. 47 at 101 (Hatfield Depo. at 76:14-77:24); at 181-83 (Shaffer Depo.); at 224-25 (Smith Depo.); ECF No. 50 ¶¶ D32-33, P50-51.) While conceding this fact, Volek, at

the same time, relies on his own uncorroborated deposition testimony that the OIG investigator began Volek's interview by asking Volek to "tell him why [Hatfield] says you're the one who complained." (ECF No. 50 ¶ P55.) At his deposition, the OIG investigator did not recall asking Volek that question during his interview. (ECF No. 47 at 186-87.) Volek does not explain how his testimony on this point, which not only contradicts admissions and assertions he made in the combined concise statement of material facts, but also is multiple-hearsay, would be admissible at trial. It is undisputed, in any event, that the OIG investigators told Hatfield that they were not investigating the Authority as a result of a complaint letter. (ECF No. 50 ¶ D33.) The record is devoid of any evidence that Jeffries or French asked the OIG investigators about a complaint letter.

The only record evidence linking Volek to the complaint letter is the testimony of Kaylene Mehalic ("Mehalic"), an Authority employee, that Hatfield told her that "Kirk," the DCED state monitor who replaced Wilson upon his retirement, showed Hatfield Volek's letter. (ECF No. 47 at 158-62 (Mehalic Depo.); ECF No. 50 ¶ P61.)[1] Mehalic asserts that this conversation with Hatfield took place after the OIG completed its interviews, after Wilson either retired or stopped visiting the Authority to perform his day-to-day job duties, but before Volek was fired. (Id.) Unfortunately, the parties failed to develop the record in such a way that a more specific date can be assigned to Mehalic's conversation with Hatfield, even though many of these dates appear to be easily determinable.

---

[1] The significance of defendants' assertion that Volek offered to pay Mehalic if she testified in his favor during this litigation is a matter properly left to a jury's determination. For purposes of summary judgment, the court must accept Mehalic's testimony as true, and cannot assess what impact such an allegation of bias might have on her credibility.

The record reflects definitively, however, that the OIG interviews were completed in April 2012, (ECF No. 46 at 12), and that Volek was laid-off on May 17, 2012, (ECF No. 50 ¶ D45). As noted previously in section I.A., the evidence with respect to the date of Wilson's retirement is contradictory and inconclusive. To summarize, Wilson testified that he retired in May 2011, yet notified Jeffries that the DCED received a complaint letter more than six months later, in December 2011, which he characterized as shortly before he retired, because it was part of his job to do so. (ECF No. 47 at 268-75 (Wilson Depo.).) This dispute is ultimately immaterial: Mehalic's own testimony, on which Volek relies, indicates that Hatfield saw Volek's letter sometime between April and May 2012.[2] Hatfield, for his part, asserts that Mehalic is the one who expressed her opinion to him that Volek wrote the letter. (ECF No. 47 at 102 (Hatfield Depo. at 80:19-81:16).) The court must resolve any factual dispute in this regard in favor of Volek and find that Hatfield told Mehalic that he saw a complaint letter drafted by Volek as early as April 2012.

### D. Personnel Adjustments

French created a document, dated April 24, 2012, which reflects, in chart form, intended personnel adjustments, with the resulting cost savings. (ECF No. 47 at 79-81 (French Chart).) This chart sets forth French's strategy to eliminate three positions, make two positions part-time, and restructure the duties and responsibilities of several other positions, resulting in a savings of nearly $200,000 a year in salaries. (Id.). Volek's position was among the positions to

---

[2] Although immaterial, it is worth noting, that Mehalic's testimony supports the theory that Wilson retired on May 22, 2012, and not in May 2011. If Kirk replaced Wilson in May 2011, Kirk would have been visiting the Authority for several months before the DCED ever received Volek's letter, and would have had various opportunities before April 2012 to show Volek's letter to Hatfield. If Wilson retired in May 2012, Kirk would have been new to the Authority and likely performing Wilson's day-to-day job duties during a transition period in spring 2012, which is precisely when Mehalic claims Kirk showed Hatfield Volek's letter.

be eliminated. (Id. at 80.) French's decision to eliminate Volek's weatherization specialist position, instead of Welsh's position, was based on many factors, including Jeffries' and Hatfield's feedback with respect to employee job performance. (ECF No. 50 ¶¶ D43-44, D46, D49-50, P82, P85, P87.) Volek produced no evidence that Jeffries relayed concerns about Volek's performance to French after January 2012. Volek was notified that his position was being eliminated on May 17, 2012. (Id. ¶ D45.)

There is no genuine dispute that the Authority planned for, and undertook, these personnel changes in 2012 and 2013 due to funding cuts. (ECF No. 47 at 79-81 (French Chart); ECF No. 37-10 at 3-4 (Interrogatory Responses).) The record is undisputed that Volek was not the only Authority employee laid-off in spring 2012, and was not the only weatherization department employee laid-off as a result of these budget cuts. (ECF No. 37-10 at 3-4 (Interrogatory Responses); ECF No. 50 ¶¶ D48, P88.) By the end of 2013, the size of the weatherization department was cut by a third, and more than half of the positions eliminated in 2012 and 2013 were in the Authority's weatherization department. (ECF No. 37-10 at 3-4; ECF No. 50 ¶ D48; P9.) There is no evidence in the record that Volek's position was filled after he left. (ECF No. 50 ¶¶ D62, P93-94.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact – that is, a fact that would affect the outcome of the suit under the governing substantive law – will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Even

then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. Id. at 248-49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The summary judgment inquiry asks whether there is a need for trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing cases); Liberty Lobby, 477 U.S. at 248-49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. Celotex, 477 U.S. at 323; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (citing Celotex, 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. FED. R. CIV. P. 56(e); see Liberty Lobby, 477 U.S. at 247-48; Celotex, 477 U.S. at 323-25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts

identified by the movant.'" Corliss v. Varner, 247 F.App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

## III.   DISCUSSION

### A. Legal Standards for Substantive Claims

#### 1.   Section 1983 - First Amendment Claim

Volek asserts a claim pursuant to 42 U.S.C. § 1983.  That statute does not create substantive rights, but instead provides remedies for deprivations of rights established elsewhere in the Constitution or federal laws. Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To prevail under § 1983, a plaintiff must prove that he: (a) suffered the deprivation of a right secured by the United States Constitution or federal law, (b) by a person acting under color of state law. Collins v. City of Harker Heights, Tex., 503 U.S. 115, 119–20 (1992); Morrow v. Balaski, 719 F.3d 160, 165-66 (3d Cir. 2013) (citing Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995).

In this case, Volek alleges that his First Amendment rights were violated because the Authority fired him in retaliation for the complaints he filed with the DCED and OIG. To establish a claim of retaliatory termination for one's lawful exercise of his freedom of speech under the First Amendment a public employee must establish: (1) that his speech was "protected activity"; and (2) that the protected speech "was a substantial or motivating factor" for the termination. Springer v. Henry, 435 F.3d 268, 275 (3d Cir. 2006); Feldman v. Phila. Housing Auth., 43 F.3d 823, 829 (3d Cir. 1994).  To establish the requisite causal connection, a plaintiff must prove either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish

a causal link. Lauren v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing cases).  If such

evidence is not available, a plaintiff must show, from "evidence gleaned from the record as a

whole," that the trier of fact should infer causation. Id.  If a plaintiff establishes his prima facie

case, then the burden shifts to defendant to prove that the same adverse action would have been

taken in the absence of the protected activity. Springer, 435 F.3d at 275; Hill v. City of Scranton,

411 F.3d 118, 125 (3d Cir. 2005).

> **2.** **Pennsylvania Whistleblower Claim**
>
> Pennsylvania's whistleblower statute states that:
>
>> No employer may discharge, threaten or otherwise discriminate or
>> retaliate against an employee regarding the employee's
>> compensation, terms, conditions, location or privileges of
>> employment because the employee or a person acting on behalf of
>> the employee makes a good faith report or is about to report,
>> verbally or in writing, to the employer or appropriate authority an
>> instance of wrongdoing or waste.

43 Pa. Cons. Stat. § 1423(a).  Pennsylvania law requires establishment of a causal connection

between an employee's termination and a report of wrongdoing or waste in order to make out a

prima facie case under this statute. Golaschevsky v. Dep't of Envtl. Res., 683 A.2d 1299 (Pa.

Commw. Ct. 1996), aff'd, 554 Pa. 157, 720 A.2d 757, 759-60 (1998).

**B. Analysis of the Section 1983 - First Amendment Claim**

For purposes of summary judgment, defendants concede that Volek's 2011 complaints to the DCED and OIG are "protected activity."[3] (ECF No. 39 at 8.) Defendants contend that Volek's First Amendment claim nevertheless fails because Volek cannot establish the requisite causal connection between that activity and French's decision to eliminate Volek's position. (Id.) Defendants argue that the more than six months that passed between Volek's complaint and his termination is not "an unusually suggestive temporal proximity," (id. at 8-9), and that there is no evidence of a pattern of antagonism against Volek, (id. at 10-11). Defendants argue that the evidence gleaned from the record as a whole also fails to establish causation. (Id. at 11-14.) Finally, even if Volek could establish the requisite causation, the Authority contends that Volek's First Amendment claim still fails because the record reflects that the Authority would have made the same decision to eliminate Volek's position in the absence of his protected activity. (Id. at 13-15.)

In opposition, Volek argues that the evidence proves causation between his protected activity and his termination because: (a) Hatfield and Jeffries knew that Volek engaged in protected activity; (b) the decision to discharge Volek was based, in part, on Hatfield's and Jeffries' complaints about Volek's job performance; (c) the timeline is unusually suggestive of retaliation; (d) there is a history of antagonism against Volek; and (e) the Authority's reason for

---

[3] Defendants are correct that they did not concede that Volek's alleged internal complaints to Hatfield and Jeffries in 2010 and 2011 qualify as protected activity, as Volek asserts in his opposition brief. (ECF No. 46 at 6.) Such complaints, made to superiors "up the chain of command" would not qualify as "protected activity." Morris v. Phila. Housing Auth., 487 F.App'x 37, 39 (3d Cir. 2012). Volek could, however, use the substance of those complaints to support an argument that the Authority could identify him as the source of the complaints to the DCED or OIG based on the similarities between those complaints, or the investigations resulting from them, and his previous complaints to his supervisors. Although this argument is theoretically cognizable, for the reasons set forth in the body of this opinion, it does not establish causation based on the record in this case.

terminating Volek is pretextual. (ECF No. 46 at 10-18.) Volek relies on the same evidence and arguments made with respect to this final contention to counter the Authority's same decision defense.

      The court concludes that there is insufficient evidence of a causal connection between Volek's protected activity and his termination, and that, in any event, the Authority established that it would have made the same decision to eliminate Volek's position even if it did not know about Volek's protected activity, and Volek failed to overcome the Authority's defense in that regard. For this reason, judgment as a matter of law must be entered with respect to Volek's § 1983 claim.

### 1. **Causal Connection**

#### (a) **Unusually Suggestive Temporal Proximity**

      Volek contends that the short passage of time between his complaint to the OIG in October 2011, and his termination in May 2012, is sufficient, standing alone, to establish causation. (ECF No. 46 at 12.)[4] If not, Volek contends that December 2011, when Wilson notified Jeffries that the DCED received a complaint letter, or some unidentified later time during the OIG's investigation, should be used as the operative date against which his May 2012 termination should be judged. (Id.) Before assessing whether Volek can establish causation by relying on an unusually suggestive temporal proximity alone, the court must examine the factual record to determine the earliest date on which a reasonable jury could conclude that the Authority had knowledge that Volek complained to the DCED or OIG. Volek bears the burden

---

[4] Volek fails to explain why, in his opposition brief, he uses his October 2011 complaint to the OIG, and not his September 2011 complaint to the DCED, as the operative date against which to judge his May 2012 termination. (ECF No. 46 at 12.) Volek's own concise statement of material facts identifies his September 2011 communication to Manz as his first external complaint. (ECF No. 50 ¶ P31.) This discrepancy is immaterial.

of producing some evidence that the relevant decision makers knew, at the time the decision was made, about his complaints to the DCED or OIG. Ambrose v. Twp. Of Robinson, 303 F.3d 488, 493 (3d Cir. 2002). Volek failed to produce any evidence to this effect.

Volek produced no evidence that the Authority knew, at the time it was happening, that Volek was communicating with the DCED or OIG in September, October, or November 2011. No reasonable jury could conclude that the Authority knew about Volek's protected activity at that time.

Volek produced no evidence that the Authority knew when the OIG arrived at its offices unannounced in November 2011, that a complaint letter from Volek triggered the visit. In fact, OIG investigators specifically explained to Authority officials that day that the OIG becomes involved only at the request of another governmental agency, and not as a result of private complaints. No reasonable jury could conclude that the Authority knew about Volek's protected activity in November 2011.

Although the record reflects that Wilson informed Jeffries in December 2011 that the DCED received a complaint letter about the Authority, there is no evidence that Wilson told Jeffries the date, author, or substance of the letter. It is undisputed that Wilson did not know these details at the time. Although Wilson knew, and communicated to Jeffries, that the DCED's director of weatherization training initially received the letter, this information would not support a reasonable inference that the Authority knew Volek sent the letter in December 2011, as Volek suggests. Although a reasonable jury could conclude, based on this fact, that the complaint letter was not sent by a taxpayer, who would not know how to reach the DCED's head weatherization trainer, it could not conclude, based on this fact, that the Authority knew that Volek sent the

letter. The extent of the reasonable inference is instead that an Authority employee, a contractor, an employee from a different county, or someone else within the government or the weatherization industry submitted the complaint; it is not that Volek submitted the complaint.

With respect to this point, Wilson's December 2011 report that the DCED received a complaint letter, would lead a reasonable jury away from an inference that the Authority knew that the OIG's investigation, which began a month earlier with the unannounced November 2011 confiscation of files, was caused by the letter. Regardless, when the Authority contacted Heim, the executive director of the DCED, at the end of 2011 to ask about the letter that Wilson told Jeffries about, Heim denied that the department received a complaint letter. No reasonable jury could conclude, based on this record, that the Authority knew about Volek's protected activity in December 2011.

The record reflects that OIG investigators interviewed Authority employees through April 2012. During the interviews, the OIG investigators specifically denied that they were investigating the Authority due to a complaint letter. There is no evidence, beyond speculation, that the Authority discovered the source of the complaint letter during the OIG interviews. Such speculation includes Volek's contention that the Authority knew that he triggered the OIG investigation because he previously made substantively similar complaints to Jeffries and Hatfield in 2010 and 2011. Although Jeffries and Hatfield deny that Volek complained to them about preferential treatment and unnecessary furnace replacements during his employment, for purposes of summary judgment, the court must accept Volek's version of the facts as true. Volek's internal complaints, nevertheless, are insufficient to impute knowledge to the Authority that Volek wrote a complaint letter to the DCED or OIG, for, at least, the following reasons.

There is no evidentiary dispute that Volek was not the only employee to complain, internally, that certain homeowners received preferential treatment from the Authority. At least Volek's fellow weatherization specialist, Welsh, expressed the same concerns to the same supervisors. Under these circumstances, a substantive complaint about preferential treatment would not identify Volek as the source. The OIG's investigation into the volume and circumstances of furnaces being replaced by the Authority would likewise not identify Volek as the source. At the pertinent time, the Authority had been identified, as a result of an audit by the state's budget office and at a state-wide industry conference, as having an unusually high rate of furnace replacements. Under these circumstances, an investigation into whether the Authority was unnecessarily replacing furnaces would not identify Volek as the only possible catalyst of such an inquiry. Concern about replacing too many furnaces was not uniquely associated with Volek at the Authority. Finally, there is no dispute that Volek submitted other complaints to his supervisors at the Authority, including about a co-worker's unprofessional behavior, the Authority's unfair pay scale and hiring practices, and the inequitable treatment of employees. The substance of Volek's complaints to his supervisors at the Authority was not so consistent and focused that a reasonable jury could conclude that the Authority must have known Volek was the reason the OIG was investigating its weatherization department. No reasonable jury could conclude that the Authority knew about Volek's protected activity during the OIG interviews, which ended in April 2012.

In reaching this conclusion the court considered that there was general speculation among the hourly employees, which includes Hatfield, about why the OIG was investigating the Authority and whether someone, including an employee, might have written a complaint letter. Although there is evidence that Volek was included among the possible employee-suspects, there is no evidence that he was the only employee-suspect. Volek failed to establish a definitive time-frame associated with these rumors. Volek produced no evidence that these rumors rose above the level of speculation, or took place at the management level. The rumors are insufficient to meet Volek's burden of producing some evidence that the relevant decision makers knew Volek complained to the DCED or OIG.

The only evidence that anyone at the Authority knew that Volek wrote a complaint letter is Mehalic's testimony that Hatfield told her that Kirk showed Hatfield a copy of Volek's letter. As discussed in section II.C, above, based on Mehalic's own testimony, the earliest Hatfield could have told her this is April 2012, and the latest is May 17, 2012, the date on which Volek was laid-off. Volek failed to adduce evidence to further narrow the time period during which that conversation may have taken place, even though he could have done so by, for example, definitively establishing the exact date on which the OIG interviews ended, or when Kirk began performing Wilson's day-to-day duties for him. Based on the record, it is entirely possible that these alleged conversions between Hatfield and Kirk, and Hatfield and Mehalic took place after the decision to lay-off Volek had been made, i.e., no later than April 24, 2012.[5] It is Volek's evidentiary burden to establish the dates by which the Authority knew about his complaint if he intends to prove causation based upon "an unusually suggestive temporal

---

[5] In this regard, it is likely that the actual decision to eliminate Volek's position was made prior to French's production of the April 24, 2012 personnel chart. Although neither party established the date on which French made the decision, that fact is ultimately immaterial.

proximity" alone. Volek failed to meet this burden. Although a one-month period (i.e., April to May), is seemingly highly suggestive of retaliation, as a general matter, in this case it is not probative of causation because Volek failed to establish that the Authority's decision makers gained knowledge of Volek's complaints before April 24, 2012. No reasonable jury could conclude that the Authority knew about Volek's protected activity before April 24, 2012, based upon only Mehalic's chronologically imprecise testimony.[6]

Volek failed to produce evidence to prove that the Authority had knowledge that he complained to the DCED or OIG before the Authority decided to eliminate his position. For that reason, Volek cannot establish that his protected activity was a substantial or motivating factor in the decision to eliminate his position based solely upon "an unusually suggestive temporal proximity."

### (b) Pattern of Antagonism, Plus Probative Timing

Volek may establish the requisite causal link by proving a pattern of antagonism coupled with probative timing. DeFlaminis, 480 F.3d at 267. Volek contends that the following facts establish this pattern: although the Authority knew of Volek's criminal assault trial and received a complaint from the victim's mother in October 2011, the Authority took no action against him until January 2012, after it learned from Wilson, in December 2011, that Volek

---

[6] The court notes that even if a reasonable jury could conclude that Hatfield knew, prior to April 24, 2012, that Volek wrote a letter to the DCED or OIG, Volek failed to produce any evidence, whether direct or circumstantial, that Hatfield relayed his knowledge to Jeffries or French, or made any performance assessments of Volek between April 1, 2012 and April 24, 2012, that could have possibly influenced Jeffries' or French's decision to eliminate Volek's position instead of Welsh's position. (ECF No. 47 at 106, 107; ECF No. 50 ¶¶ D10, D11, P78, P80-81) (Hatfield last complained about Volek's performance in June 2011).) Volek's speculation that Hatfield must have told Jeffries that he saw Volek's letter, and that Jeffries must have told French, and his denial of defendants' proof to the contrary based only upon the assertion that Jeffries' testimony should be disregarded because he is an interested witness, is insufficient to overcome summary judgment. (ECF No. 50 ¶ D58.)

wrote a complaint letter to the DCED; thereafter, the Authority antagonized Volek by running a criminal background check, asking a utility company customer whether Volek was still eligible to perform services for it, and expressing concern internally among management with respect to Volek's handling of confidential information in light of the complaint from Mrs. Over. (ECF No. 46 at 13-14.)[7] All these allegedly antagonistic actions took place in January 2012. For various reasons, no reasonable jury could conclude that this chain of events establishes causation.

As already discussed above, there is no evidence that the Authority knew, or had any reason to believe, that Volek was the source of a complaint letter that Wilson told Jeffries about in December 2011, contrary to Volek's assertion. The court previously explained why the earliest that a reasonable jury could conclude that the Authority knew Volek complained to the DCED or OIG is April 2012. For this reason alone, any purported antagonism against Volek in January 2012 could not have been caused by the Authority's alleged knowledge that Volek filed a complaint against it with the DCED. It is impossible for events taking place in January 2012 to be caused by knowledge acquired in April 2012. The chronology does not support a reasonable jury finding of causation based on a pattern of antagonism.

Volek makes much of the fact that the Authority failed to discipline him in October 2011, when he was tried on assault charges and Mrs. Over complained about him, but relied on those factors in January 2012 to antagonize him by a) conducting an updated criminal

---

[7] There is no evidence to support Volek's assertion that "Jeffries wanted to have Volek fired" in January 2012. (ECF No. 46 at 14; ECF No. 50 ¶ P76.) The sole evidence on which Volek relies to support this statement is French's deposition testimony, which reflects only that Jeffries and French had some discussions, as early as January 2012, about laying-off Volek. Regardless, the chronology with respect to Jeffries' alleged desire to fire Volek in January 2012, suffers from the same defect as Volek's other arguments: i.e., the discussion between Jeffries and French predates the Authority's earliest possible knowledge that Volek engaged in protected activity. See infra Sec. III.B.1(a) and (c).

background check, b) asking a utility customer whether he could work on their contract, and c) criticizing his ability to keep information confidential internally among management. This factual scenario is not probative of causation in this case because there is no basis for a reasonable jury to conclude that the Authority knew, in January 2012, that Volek engaged in protected activity.

Volek failed to produce sufficient evidence for a reasonable jury to find that the Authority engaged in a pattern of antagonism, coupled with probative timing. For that reason, Volek cannot establish that his protected activity was a substantial or motivating factor in the decision to eliminate his position on this causation theory.

### (c) Other Evidence Gleaned from the Record

If a plaintiff is unable to establish causation using temporal proximity or a pattern of antagonism, he can satisfy his prima facie case by otherwise establishing that the fact-finder could infer causation from "evidence gleaned from the record as a whole." DeFlaminis, 480 F.3d at 267. In this case, Volek argues that "there is a significant amount of evidence that casts doubt on the Defendants' alleged legitimate reasons for terminating plaintiff's employment that would allow a reasonable jury to conclude that Volek's protected activity was a factor in the decision to terminate his employment." (ECF No. 46 at 14-15.)[8] As Volek acknowledges, his final argument on causation collapses into his opposition to defendants' same decision defense. In other words, Volek contends that he can prove causation by attacking the validity of the evidence offered by the Authority in support of its position that it would have laid Volek off even if it had no knowledge of his protected activity. It is Volek's burden to prove causation by a

---

[8] The correct standard of causation in a First Amendment retaliation case is "a substantial or motivating factor," not "a factor." Springer, 435 F.3d at 275; Feldman, 43 F.3d at 829. The court analyzes Volek's arguments under the proper legal standard.

preponderance of the evidence in order to establish a <u>prima facie</u> case. Only if Volek does so is the Authority required to offer any evidence that it would have made the same decision to terminate Volek. Given this evidentiary framework, the court will analyze the evidence of pretext relied upon by Volek to determine whether it would be sufficient for a reasonable jury to find that Volek's protected activity caused his termination. The court concludes that it does not.

The Authority asserts that Volek was laid-off in May 2012, due to budgetary concerns caused by decreases in grant funding and a resultant decline in weatherization workload. (ECF No. 39 at 14-15.) According to the Authority, Volek's position was eliminated, instead of Welsh's, because: (1) Welsh had more seniority; (2) Jeffries and Hatfield discussed concerns about Volek's performance in the past; (3) Volek's criminal assault charge was published in the local newspaper; and (4) taxpayers complained about Volek's dissemination of confidential information. (<u>Id.</u> at 15.) Volek contends that a jury could either disbelieve these reasons, or believe that retaliation was more likely than not the real reason for his termination because: (1) the Authority's reasons for discharging Volek have evolved over time; (2) the Authority was fully funded through calendar year 2012 and Volek was the only weatherization department employee laid-off in May 2012; and (3) Volek was told to train his replacement before he was laid-off. (ECF No. 46 at 15-18.)

Volek can prove that a reasonable jury could disbelieve the Authority's reasons for laying him off by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' ...and hence infer 'that the employer did not act for [the asserted] non-[retaliatory] reasons.'" <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994). The question "is not whether the employer made the best, or even a

sound, business decision;" it is whether the real reason for the employment decision is retaliation. Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).

Volek argues that the Authority's reasons for eliminating his position are unbelievable because they "have evolved over time." (ECF No. 46 at 15.) In support of this argument Volek explains that he was told on May 17, 2012, that he was being laid-off due to funding cuts, but during this litigation the Authority offered various other reasons for his termination, such as poor performance, his criminal assault charge, and the complaint from Mrs. Over. (Id. at 16.) Volek misconstrues the record. The Authority consistently maintained that budget cuts necessitated lay-offs and personnel restructuring, beginning in the second quarter of 2012.

The chart prepared by French, dated April 24, 2012, demonstrates that the Authority did not fabricate concerns over the budget for purposes of this litigation. Volek's assertion that all positions were funded through calendar year 2012, and that the other employees laid-off at the same time as him were not members of the weatherization department, are without consequence. To contend that the Authority should have waited until funding was actually cut, instead of anticipating the impending cuts and adjusting personnel expenses ahead of time, is the epitome of second-guessing the soundness of the Authority's business decisions; this the court, and a jury, cannot do. The record reflects that the Authority did, in fact, incur the budget cuts for which it was preparing in early 2012. The record reflects both that other employees were laid-off at the same time as Volek, and that other weatherization department employees were ultimately laid-off as a result of budget cuts. In fact, it is undisputed that by the end of 2013, the size of the weatherization department decreased by a third, and more than half of the positions eliminated in 2012 and 2013 were in the Authority's weatherization department. No reasonable

jury could disbelieve the Authority's proffered reason for eliminating Volek's position on the basis that the Authority had not yet incurred budget cuts in May 2012.

The fact that the Authority offered explanations, in the context of this litigation, with respect to why Volek, and not Welsh, was laid-off in May 2012, does not prove that the Authority's reasons for termination are not worthy of belief because they have "evolved over time." Volek's criminal assault charge, performance deficiencies, taxpayer complaints, and lack of seniority explain why Volek's position was selected for elimination as compared to Welsh's position. When faced with the necessity of eliminating one weatherization specialist position due to budget cuts, the reasons offered by the Authority tipped the scales in favor of retaining Welsh instead of Volek. The fact that Volek was not previously disciplined or terminated for any of these reasons reinforces that budget cuts were the motivation behind Volek's lay-off. In the absence of budgetary concerns, none of these factors caused dismissal; when faced with making choices as part of a personnel downsizing due to budget cuts, these factors caused management to terminate Volek instead of Welsh. The ultimate impetus for termination has remained the same – budgetary constraints. No reasonable jury could conclude that the Authority fabricated concerns over the budget as a subterfuge for firing Volek because he complained to the DCED or OIG.

Volek's final argument is that the Authority's need to eliminate his position due to a decrease in workload is not to be believed because Volek was told to train Santillo to do Volek's job before he was laid-off, and Santillo completed a two-week home inspection certification program after Volek was laid-off. (ECF No. 46 at 18.) Defendants counter that a) Santillo was assigned to ride with Volek in spring 2012 because Volek was injured and needed assistance with certain physical tasks, and b) Santillo attended the state-sponsored training

because it was at no cost to the Authority and Santillo's schedule permitted him to attend. (ECF No. 50 ¶ D69.) These disputes are immaterial. There is no evidence in the record that Santillo replaced Volek, or that anyone filled the second weatherization specialist position after Volek was laid-off. Even if Volek was told to train Santillo around March 2012, and even if Santillo attended a training session, these facts are inconsequential if Santillo did not, in fact, become a weatherization specialist. Volek produced no evidence that Santillo became a weatherization specialist after Volek was laid-off, or that Santillo, or anyone else, performed Volek's job after May 17, 2012.

Case law would permit Volek to survive summary judgment if he could demonstrate, through evidence of record, that retaliation was more likely than not a substantial or motivating factor in his termination. Fuentes, 32 F.3d at 762. The kinds of evidence that Volek could rely upon are: 1) whether the employer previously retaliated against the plaintiff; 2) whether the employer has retaliated against other persons for exercising their First Amendment rights; and 3) whether the employer has previously treated more favorably similarly situated persons who have not exercised their First Amendment rights. Simpson, 142 F.3d at 644–45 (3d Cir. 1998). Volek failed to adduce any evidence to establish any one of these three factors, and therefore he cannot prove causation on this basis.

Volek failed to produce other evidence gleaned from the record as a whole that could support a reasonable jury finding that his protected activity was a substantial or motivating factor in the decision to eliminate his position.

Because Volek failed to come forth with any evidence proving, under any theory of causation, that his complaints to the DCED or OIG were a substantial or motivating factor for

the Authority's decision to eliminate his position, Volek cannot make out a <u>prima</u> <u>facie</u> case of First Amendment retaliation. His § 1983 claim, therefore, cannot survive summary judgment on this ground alone.

### 2. **Same Decision Defense**

The Authority contends that, even assuming that Volek did produce sufficient evidence to prove a <u>prima</u> <u>facie</u> case of First Amendment retaliation, the Authority can prove, as a matter of law, that it would have made the same decision to eliminate Volek's position even in the absence of such protected activity. <u>Springer</u>, 435 F.3d at 275; <u>Hill</u>, 411 F.3d at 125. As set forth above, the Authority listed those factors that led it to lay-off Volek, instead of Welsh. The record adequately supports each of the Authority's reasons. Volek does not, and could not on this record, challenge the facial accuracy of the Authority's reasons. It is indisputable that a) Volek was tried on an assault charge in October 2011, b) Hatfield and Jeffries discussed Volek's subpar performance in August 2010 and June 2011, c) Mrs. Over complained to the Authority about Volek in October 2011, and d) Welsh had more seniority than Volek. Volek cannot counter the Authority's same decision defense by arguing that the reasons given by the Authority for eliminating his position, and not Welsh's position, are not true. Volek, instead, makes the same arguments and relies on the same evidence in opposition to the Authority's same decision defense as he did in attempting to prove causation based on the theory that "other evidence gleaned from the record" establishes that the Authority's reasons for firing him were a pretext for retaliation. For the same reasons that Volek could not establish causation based on this theory, he cannot overcome the Authority's same decision defense.

Even if Volek could establish his prima facie case, the evidence of record is such that no reasonable jury could return a verdict in favor of Volek because the Authority would have made the same decision in the absence of Volek's protected activity. As discussed above in detail, Volek produced no evidence that would permit a reasonable jury to conclude that the Authority's proffered reasons for his termination were a pretext for retaliation.

For all of these reasons, on this alternative basis, Volek's § 1983 claim cannot survive summary judgment.

## C. Analysis of Pennsylvania Whistleblower Claim

Volek's remaining claim is brought pursuant to Pennsylvania's whistleblower statute. A district court may decline to exercise supplemental jurisdiction where the federal claims are no longer viable. 28 U.S.C. § 1367(c)(3); Trinity Indus., Inc. v. Chicago Bridge & Iron Co., 735 F.3d 131, 135 (3d Cir. 2013). The decision with respect to whether to exercise supplemental jurisdiction under these circumstances is within the district court's discretion, and factors such as when the federal claims are removed from the case, and under what circumstances, are relevant. 28 U.S.C. § 1367(c)(3), cmt. (1988) (Discretionary Rejection of Supplemental Jurisdiction); Growth Horizons, Inc. v. Delaware Cnty., Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).

The Court of Appeals for the Third Circuit has held that, where all federal claims are dismissed before trial, "the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted). In this case, those considerations counsel in favor of deciding the Pennsylvania whistleblower claim. Both parties acknowledge that the same legal standards and

factual background apply to both the First Amendment claim and the Pennsylvania statutory claim. (ECF No. 39 at 16 ("[f]or the same reasons as the Plaintiff's § 1983 claim fails, so does his Pennsylvania Whistleblower claim"); ECF No. 46 at 18-19 ("the same evidence supporting causation of Volek's First Amendment retaliation claim also precludes summary judgment on his Pennsylvania whistleblower claim").)  There is no dispute that, in this case, the dispositive issue on the First Amendment claim, i.e., causation, is equally dispositive of the Pennsylvania whistleblower claim.  Just as Volek failed to adduce sufficient evidence of causation for purposes of his First Amendment claim, he failed to adduce sufficient evidence of causation for a jury to find in his favor with respect to the statutory whistleblower claim.

The court, therefore, will exercise jurisdiction over the pendent state law claim, and enter judgment in favor of all defendants for the same reasons set forth in the court's prior discussion of Volek's § 1983 claim.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment is granted. An appropriate order will be filed contemporaneously with this opinion, and this case will be closed.


Date: June 3, 2014                                          BY THE COURT:


                                                            <u>/s/ *Joy Flowers Conti*</u>
                                                            Joy Flowers Conti
                                                            Chief United States District Judge